Nancy WILSON, Appellant,

v.

Dr. Ken KORTHAUER, Appellee.

No. 14–99–00051–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

May 18, 2000.

Otto D. Hewitt, III, Alvin, Sam M. Yates, jr., Houston, for appellants.

John R. Strawn, Jr., Houston, for appellees.

Panel consists of Justices ANDERSON, FROST, and HUTSON–DUNN.*

## OPINION

KEM THOMPSON FROST, Justice.

This is a medical malpractice case in which the appellant/patient claims the trial court erred in entering summary judgment in favor of the appellee/doctor because: (a) the appellant's third amended petition, filed after the appellee/doctor's amended summary judgment motion, raised a new claim, (b) the appellee/doctor failed to prove the appellant/patient's claims were barred by limitations, (c) the appellee/doctor failed to prove the lack of causation, (d) the trial court misapplied the summary judgment rules and standards and misplaced the summary judgment burden, and (e) the appellee/doctor's summary judgment proof, consisting of his own affidavit, was inadequate. We affirm the decision of the trial court.

### FACTUAL BACKGROUND

On December 14, 1994, the appellant, Nancy Wilson, injured her wrist when she fell off a stool while in one of Dr. Franklin Rose's examining rooms. The next day, Ms. Wilson sought treatment for her injury from her primary care physician at University Medical Group Clinic ("UMG"). That physician ordered x-rays of Ms. Wilson's left wrist and after diagnosing a fracture, put her left wrist in a volar splint. The primary care physician then referred Ms. Wilson to appellee, Ken M. Korthauer, M.D., an orthopedic specialist, in accor-

---

* Senior Justice D. Camille Hutson–Dunn sitting by assignment.

dance with the provisions of Ms. Wilson's Health Maintenance Organization ("HMO") plan. The same day, December 15, 1994, Dr. Korthauer examined Ms. Wilson's left wrist and reviewed the x-rays she had provided from UMG. Dr. Korthauer diagnosed a Colles fracture of the distal radius and instructed Ms. Wilson (1) to continue to wear the volar splint and (2) to have her wrist examined and x-rayed at UMG every two weeks until the fracture healed. Dr. Korthauer told Ms. Wilson that the fracture should heal in about four to six weeks. Approximately two weeks later, on December 28, 1994, Ms. Wilson saw her UMG physician for x-rays and an examination. She returned to UMG for follow-up visits on January 11, January 25, February 8, March 28, April 12, and May 30, 1995. The UMG records show that Ms. Wilson's Colles fracture had healed by her February 8, 1995 office visit.

On May 30, 1995, nearly four months after Ms. Wilson's Colles fracture had healed, a UMG physician again referred Ms. Wilson to Dr. Korthauer for an orthopedic consult. The UMG physician made this referral because Ms. Wilson was unable to use her left hand as well as she had prior to the fracture. Again, Dr. Korthauer saw Ms. Wilson the same day the UMG physician made the referral. After reviewing her x-rays from UMG, Dr. Korthauer found that Ms. Wilson had an ulnar styloid fracture which had not healed. He explained to Ms. Wilson that while this type of fracture often will not heal, it usually does not cause much pain. During this visit, Dr. Korthauer also noted from the x-ray that Ms. Wilson's Colles fracture had healed with some impaction and shortening of the bone. Dr. Korthauer recommended that Ms. Wilson undergo physical therapy to assist with her coordination and the use of her left hand. The May 30th visit was the last time Dr. Korthauer saw Ms. Wilson before the parties became em-broiled in litigation approximately two years later.

## PROCEDURAL BACKGROUND

Ms. Wilson filed suit against Dr. Rose on February 18, 1997.[1] She joined Dr. Korthauer as a defendant in the suit on April 13, 1997. Ms. Wilson alleged that Dr. Korthauer had caused a deformity of her left upper extremity by failing to: (1) properly evaluate the original injury, (2) consider the spasticity in the injured upper extremity, and (3) properly immobilize the fracture on each office visit. Approximately one year later, Dr. Korthauer moved for summary judgment solely on the ground that Ms. Wilson's claims were barred by the statute of limitations. The trial court denied that motion, set the case for trial on the court's September 21, 1998 docket, and entered a scheduling order which set August 21, 1998, as the deadline for amending pleadings in the case. On August 27, 1998, Dr. Korthauer sought leave to file an amended summary judgment motion. Ms. Wilson objected, and the trial court denied Dr. Korthauer's request for leave. A few days later, on August 31, 1998, after the expiration of the deadline for amending pleadings, Ms. Wilson filed her third amended petition, which contained a new allegation—that Dr. Korthauer failed to remain in charge of her follow-up treatment. Ms. Wilson did not seek leave to file her untimely pleading, and Dr. Korthauer moved the court to strike it. The trial court, however, failed to rule on Dr. Korthauer's motion.

When the case was called to trial, the court elected to re-visit Dr. Korthauer's request for leave to file his amended motion for summary judgment. On reconsideration, the trial court agreed to hear the motion for summary judgment, and counsel presented their arguments. Two days later, the trial court granted Dr. Korthauer's motion for summary judgment

1. The controversy between Ms. Wilson and Dr. Rose was resolved, and she non-suited her claims against him.

and entered final judgment that Ms. Wilson take nothing on her claims.

## STANDARD OF REVIEW

■ We review summary judgments in accordance with the following rules:

(1) The movant has the burden of showing that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law;

(2) In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true; and

(3) Every reasonable inference must be indulged in favor of the non-movant and any doubts will be resolved in her favor.

*See American Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997) (citing *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985)). A movant "who conclusively establishes all of the elements of an affirmative defense" or "who conclusively negates at least one of the essential elements of each of the plaintiff's causes of action" is entitled to summary judgment. *Cathey v. Booth,* 900 S.W.2d 339, 341 (Tex.1995); *see also Trail Enterprises, Inc. v. City of Houston,* 957 S.W.2d 625, 630 (Tex.App.—Houston [14th Dist.] 1997, pet. denied), *cert. denied,* 525 U.S. 1070, 119 S.Ct. 802, 142 L.Ed.2d 663 (1999).

## ISSUES PRESENTED FOR REVIEW

In her first challenge to the summary judgment, Ms. Wilson asserts the trial court erred in granting Dr. Korthauer's amended motion because she had raised a new claim in her third amended petition that was not addressed by that motion. In response, Dr. Korthauer asserts that the third amended petition was not properly before the trial court. In addressing these issues, we will first make a threshold determination as to whether Ms. Wilson's third amended petition constitutes her live pleading in the case and, if so, whether Dr.

Korthauer's amended motion for summary judgment encompassed all claims asserted in it. Then, we will consider whether summary judgment was appropriate on any of the grounds Dr. Korthauer asserted in the trial court.

## Live Pleadings

Determination of whether a pleading is properly before the court is governed by Texas Rules of Civil Procedure 63 and 166 and interpretive case law. Rule 63, entitled "Amendments and Responsive Pleadings" states:

> [P]arties may amend their pleadings ... as they may desire by filing such pleas with the clerk at such time as not to operate as a surprise to the opposite party; provided, that any pleadings, responses or pleas offered for filing within seven days of the date of trial or thereafter, or *after such time as may be ordered by the judge under Rule 166,* shall be filed only after leave of the judge is obtained, which *leave shall be granted by the judge unless there is a showing that such filing will operate as a surprise to the opposite party.*

TEX.R. CIV. P. 63 (emphasis added). Rule 166, governing the pretrial conference, provides, "[t]he court shall make an order that recites ... the amendments allowed to the pleadings, [and] the time within which same may be filed...." TEX.R. CIV. P. 166. Despite the seemingly unambiguous language of these rules which suggests that the burden of obtaining permission to file an untimely pleading is on the party seeking leave, case law indicates that the trial court may be deemed to have considered an untimely pleading even where the late filing party failed to request leave.

■ Texas appellate courts apply a liberal interpretation in determining whether a trial court granted leave to file pleadings beyond the prescribed deadline. *See Goswami v. Metropolitan Sav. and Loan,* 751 S.W.2d 487, 490 (Tex.1988) (finding trial court granted leave to file late pleading

where pleading was filed within seven days of summary judgment proceeding, which is considered a trial within the meaning of Rule 63); *Johnson v. Rollen*, 818 S.W.2d 180, 183 (Tex.App.—Houston [1st Dist.] 1991, no writ) (finding trial court granted leave to file late pleading where pleading was filed after deadline imposed by docket control order). Based on the Texas Supreme Court's holding in *Goswami*, we must *presume* the trial court granted leave to file a late pleading even though the filer failed to request leave when: (1) the record fails to show that the trial court did *not* consider the amended pleading, and (2) there is not a sufficient showing of surprise or prejudice on the part of the opposing party. *See Goswami*, 751 S.W.2d at 490; *Rose v. Kober Financial Corp.*, 874 S.W.2d 358, 361 (Tex.App.—Houston [14th Dist.] 1994, no writ); *Johnson*, 818 S.W.2d at 183.

In determining if the first prong of the *Goswami* presumption is satisfied, the reviewing court is to consider whether the amended petition was part of the record before the trial court and whether the judgment states that the trial court considered all the pleadings on file. *See Goswami*, 751 S.W.2d at 490. If both of these questions are answered in the affirmative, the first prong of the test is met. *See id.* Here, Ms. Wilson's third amended petition was filed in the trial court, and is part of the record; additionally, the final judgment states that the trial court considered "the pleadings on file herein." Therefore, because the record does not show that the trial court did *not* consider the amended petition, we find that the first prong of the test for application of the *Goswami* presumption is satisfied.

The second prong of the test focuses on the surprise or prejudice to the party opposing the filing of the amended pleading, including whether that party moved to strike the late-filed pleading. *See id.* The record shows that Dr. Korthauer filed a motion to strike Ms. Wilson's third amended petition and that he alleged surprise and prejudice flowing from her untimely filing. However, Dr. Korthauer failed to obtain a ruling on his motion to strike. To preserve a complaint for appeal, the record must show that the trial court ruled or refused to rule on a motion. *See* TEX. R.APP. P. 33.1(a)(2). Texas case law holds that absent such a showing, the appellate court is to *presume* the trial court considered the late-filed amended petition in accordance with *Goswami*. *See, e.g., City of Corinth v. Gladys*, 916 S.W.2d 618, 620–21 (Tex.App.—Fort Worth 1996, no writ) (presuming trial court considered late-filed petition where no ruling on either motion to strike or motion for leave to amend petition); *Johnson*, 818 S.W.2d at 183 (presuming trial court granted leave to file late-filed amended petition where no ruling on motion to strike). While application of this presumption seems to unfairly place the burden on the party resisting the untimely filing (Dr. Korthauer), instead of on the dilatory party that missed the court-ordered deadline (Ms. Wilson), we are compelled to follow precedent in deciding this issue. Therefore, we find that because Dr. Korthauer failed to obtain a ruling on his motion to strike, there is not a sufficient showing of surprise or prejudice to overcome the second prong of the test for application of the *Goswami* presumption.[2] Having concluded that both prongs are satisfied, we must find that the *Goswami* presumption applies. Accordingly, we presume that Ms. Wilson's third amended petition was properly before the trial court, and therefore, we treat it as the live pleading in the case.

We now turn to consider whether the third amended petition raised a new claim that was not addressed by Dr. Korthauer's amended motion for summary judgment. Notably, the third amended

2. We note that based on the nature of the amendment (i.e., a clarification rather than a new claim), Dr. Korthauer would not likely have been able to demonstrate surprise or prejudice in any event.

petition differs from the second amended petition only by the inclusion of the following additional allegation:

> Dr. Korthauer allowed non-orthopedic surgeon medical practitioners to carry out follow-up care. The failure of Defendant Korthauer to remain in charge of this needed follow-up was a proximate cause of the developed deformity of the upper left extremity....

Like the second amended petition, the third amended petition alleges a medical malpractice claim arising out of Dr. Korthauer's treatment of Ms. Wilson's left upper extremity.[3] Therefore, the third amended petition does not raise a new claim.

■ Even if the third amended petition did raise a new claim, we would not necessarily have to remand for further proceedings. Generally, summary judgment cannot be granted on a claim not addressed in the summary judgment proceeding. *See* Tex.R. Civ. P. 166a(c); *Chessher v. Southwestern Bell Telephone*, 658 S.W.2d 563, 564 (Tex.1983). However, summary judgment may be granted on later pled causes of action if the grounds asserted in the motion show that the plaintiff could not recover from the defendant on the later pled cause of action. *See Lampasas v. Spring Center, Inc.*, 988 S.W.2d 428, 437 (Tex.App.—Houston [14th Dist.] 1999, no pet.); *see also Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 672 (Tex. App.—Houston [1st Dist.] 1996, no writ) (finding amended petition merely reiterated same essential elements of original claim in another fashion). Therefore, if the grounds asserted in Dr. Korthauer's amended motion for summary judgment show that Ms. Wilson could not recover on the later pled claim in any event, it is not necessary to remand for further proceedings; we may simply affirm the judgment.

3. The essential elements of a medical malpractice claim are: (1) a duty by the physician to act according to a certain standard; (2) a breach of the applicable standard of care; (3) an injury; and (4) a causal connection between the breach of care and the inju-

## Propriety of Summary Judgment

In his amended motion, Dr. Korthauer sought summary judgment based on (1) the affirmative defense of limitations and (2) Ms. Wilson's inability to establish a breach of the applicable standard of care, an element of her *prima facie* case for medical malpractice. As previously noted, a movant "who conclusively establishes all of the elements of an affirmative defense" or who "conclusively negates at least one of the essential elements of each of plaintiff's cause of action" is entitled to summary judgment. *Cathey*, 900 S.W.2d at 341; *Trail Enterprises, Inc.*, 957 S.W.2d at 630.

### *Limitations Defense*

As grounds for his motion, Dr. Korthauer asserted that the statute of limitations barred the claims arising from his treatment of Ms. Wilson on December 15, 1994, during her first visit to his office. In an effort to defeat this affirmative defense, Ms. Wilson argued that Dr. Korthauer established a course of treatment which did not end until her second office visit on May 30, 1995, and therefore, her claims were not time-barred.

The Medical Liability and Insurance Improvement Act sets out the statute of limitations for medical malpractice cases. *See Rowntree, II, M.D. v. Hunsucker*, 833 S.W.2d 103, 104 (Tex.1992). It provides:

> Notwithstanding any other law, no health care liability claim may be commenced unless the action is filed *within two years* from the occurrence of the breach or tort or from the date *the medical or health care treatment* that is the subject of the claim or the hospitalization for which the claim is made is completed ...

ry. *See LeNotre v. Cohen*, 979 S.W.2d 723, 727 (Tex.App.—Houston [14th Dist.] 1998, pet. denied) (citing *Elam v. Yale Clinic*, 783 S.W.2d 638, 642 (Tex.App.—Houston [14th Dist.] 1989, no writ)).

Tex.Rev.Civ. Stat. Ann. Art. 4590i, § 10.01 (Vernon Supp.2000) (emphasis added). An extra 75 days is added to the two-year limitations period when a pre-suit "notice of claim" is served. *See id.* at § 4.01(c). Neither party disputes that Ms. Wilson served a pre-suit notice of claim; therefore, the limitations period is two years and 75 days from either the date the breach occurred *or* the date Dr. Korthauer's medical treatment for Ms. Wilson's left wrist ended.[4]

The three points in time set out in section 10.01—[i] occurrence of breach, [ii] completion of medical or health care treatment, and [iii] completion of hospitalization—are to aid plaintiffs who cannot pinpoint the exact date of the injury. *See Kimball v. Brothers, M.D.,* 741 S.W.2d 370, 372 (Tex.1987). The statutory provision which reads " 'from the date the medical or health care treatment that is the subject of the claim ... is completed' contemplates a situation wherein the patient's injury occurs during a course of treatment for a particular condition and the only readily ascertainable date is the last day of treatment." *Id.* For example, cases which allege mis-diagnosis or mistreatment often involve an injury occurring over the course of treatment. *See id.* Not surprisingly, the facts of each case determine not only whether a patient is receiving a course of treatment but also when that treatment ends. *See Damron v. Ornish,* 862 S.W.2d 683, 685 (Tex.App.—Dallas 1993, writ denied) (citing *Rowntree,* 833 S.W.2d at 106). In making these determinations, courts have considered whether: (a) the patient-physician relationship is established with respect to the condition that is the subject of litigation; (b) the physician continues to examine the patient; and (c) the condition requires further services from the physician. *See id.* (citing *Rowntree,* 833 S.W.2d

at 106). The third consideration is not pertinent in determining whether a patient is receiving a course of treatment. It is axiomatic that failing to establish a course of treatment does not prove the patient is receiving a course of treatment. *See Bala v. Maxwell,* 909 S.W.2d 889, 892 (Tex.1995) *(citing Rowntree,* 833 S.W.2d at 105–06). Therefore, even if the condition requires further services, failing to provide those services does not prove the patient is receiving a course of treatment.

Accordingly, in determining whether a patient was receiving a course of treatment, we focus on whether the patient-physician relationship was established with respect to the condition that is the subject of litigation and whether the physician continued to examine the patient. Texas courts have declined to find a course of treatment in several scenarios. For instance, when the doctor does not see the patient between the date of mis-diagnosis and the date of the correct diagnosis (discovery of the mis-diagnosis),[5] no course of treatment is established. *See id.* Likewise, if there are "no regular examinations or other services, and no return appointments scheduled," merely prescribing medication for a condition not shown to be related to the injury does not "demonstrate sufficient involvement by the physician to constitute a continuing course of treatment." *Rowntree,* 833 S.W.2d at 108.

Ms. Wilson argues that she was receiving a continuous course of treatment from Dr. Korthauer until May 30, 1995, because until that date, Dr. Korthauer had a duty to supervise and monitor the non-orthopedic medical providers he instructed her to see for follow-up care. The undisputed facts in the record do not support her contention. UMG originally

---

4. Because Ms. Wilson was not hospitalized, neither party claims the limitations period started when hospitalization was completed.

5. However, if a doctor continues to see a patient, the patient can establish that the doctor had a duty to follow-up on the condition

during each subsequent visit, thus establishing a course of treatment. *See Bala v. Maxwell,* 909 S.W.2d 889, 891 (Tex.1995) (citing *Chambers v. Conaway,* 883 S.W.2d 156, 157–58 (Tex.1993)).

referred Ms. Wilson to Dr. Korthauer for an orthopedic consult in connection with a fractured radius and ulna on December 15, 1994. After examining her, Dr. Korthauer told her to continue to wear the volar splint prescribed by her UMG primary care physician and to see her primary care physician for follow-up care. The uncontroverted evidence shows Dr. Korthauer did not see her again until May 30, 1995. On that date, her primary care physician again referred Ms. Wilson to Dr. Korthauer. The summary judgment evidence demonstrates that the particular condition for which the UMG physician referred Ms. Wilson to Dr. Korthauer in May 1995, was distinctly different from the condition for which she sought an orthopedic consult in December 1994.[6] As in *Bala,* Dr. Korthauer did not see or consult with Ms. Wilson between the date of the alleged mistreatment (December 15, 1994) and the date of discovery of the result of the alleged mistreatment. As in *Rowntree,* there were no examinations or other services, routine or otherwise, scheduled or contemplated after the initial visit. Dr. Korthauer did not schedule any follow up appointments with Ms. Wilson, nor is there any indication in the record that any further treatment by Dr. Korthauer was contemplated at the conclusion of the December 1994 visit. Notably, Ms. Wilson does not claim that Dr. Korthauer advised her to return to see him, that he continued to examine her during that time, or that she scheduled the May 1995 visit on her own, i.e., independent of the referral.[7] Moreover, there is nothing in the record to suggest an ongoing patient-physician relationship nor any indication of ongoing

medical treatment or examination by Dr. Korthauer. The evidence shows that a UMG physician referred Ms. Wilson to Dr. Korthauer in each instance for a one-time orthopedic consult under Ms. Wilson's HMO plan. Even construing the summary judgment evidence in the light most favorable to Ms. Wilson, it fails to show any established patient-physician relationship with respect to the fracture in Ms. Wilson's left wrist. On this record, we conclude there is not a showing of sufficient involvement by Dr. Korthauer to constitute a course of treatment.

In the absence of a course of treatment, the limitations period for all allegations of medical malpractice must begin on the date of the office visit to which they pertain. Therefore, the limitations period for any breaches alleged to arise from the office visit on December 15, 1994, including a breach of the duty to supervise and monitor Ms. Wilson's follow-up care, began on that date. Likewise, the limitations period for all allegations of negligence arising from the May 30, 1995, office visit began on May 30, 1995. The statute of limitations bars all claims arising from Dr. Korthauer's treatment of Ms. Wilson on December 15, 1994, because the two-year and 75 day limitations period applicable to those claims expired on February 28, 1997, more than a month before Ms. Wilson added Dr. Korthauer as a defendant in the suit. Accordingly, as a matter of law, the statute of limitations bars all claims arising from Dr. Korthauer's treatment of Ms. Wilson on December 15, 1994, including the claim in her third amended petition that Dr. Korthauer had a duty to remain

**6.** The UMG physician made the second referral because Ms. Wilson was unable to use her left hand as well as she had been able to use it before the fracture. During the May 1995 visit, Dr. Korthauer discovered the Colles fracture had healed with some impaction and shortening of the bone and that the ulnar styloid fracture had not healed.

**7.** The only evidence Ms. Wilson produced that might address whether a patient-physician relationship existed is a section of the office

visit form from her May 1995 visit. The form has two types of patients listed—new patients and established patients. The form, which appears to be for record and billing purposes, indicates that Ms. Wilson is as an "established patient." While we indulge every reasonable inference in favor of the nonmovant, it is not reasonable to infer from this form that Ms. Wilson and Dr. Korthauer shared an established patient-physician relationship with respect to the fracture.

in charge of her follow-up treatment. Therefore, even if the third amended petition alleges a new claim not addressed by the summary judgment motion, the new claim is time-barred.

We find the trial court did not err in granting summary judgment for Dr. Korthauer as to events arising from the December 15, 1994 office visit. However, the remaining claim arising from the May 1995 office visit survives because it was asserted prior to the expiration of the two-year limitations period governing that claim.

### Challenge to Claimant's Prima Facie Case

 The only remaining issue is whether the trial court properly granted summary judgment on the malpractice claim arising from the office visit on May 30, 1995. In his amended summary judgment motion, Dr. Korthauer attacked a critical element of this claim—breach of the applicable standard of care.[8] Dr. Korthauer sought to negate this essential element through the presentation of his own expert testimony as well as the expert opinion of Lawrence Wilk, M.D., Ms. Wilson's expert.[9] Testimony from these experts conclusively establish that Dr. Korthauer did not breach the applicable standard of care when he treated Ms. Wilson on May 30, 1995. Dr. Wilk candidly testified that he was not critical of anything Dr. Korthauer did or did not do during the May 30, 1995 office visit and that he found that Dr. Korthauer's treatment of Ms. Wilson on that day was proper. On this uncontroverted record, we conclude as a matter of law that Dr. Korthauer did not breach the standard of care on May 30, 1995; therefore, Ms. Wilson's claim of negligence arising out of

acts or omissions on that day was effectively negated. Accordingly, the trial court did not err in granting summary judgment for Dr. Korthauer as to events arising from the May 30, 1995 office visit.

### CONCLUSION

The trial court correctly entered summary judgment in favor of Dr. Korthauer (1) as to the events arising from the December 15, 1994 office visit based on Dr. Korthauer's affirmative defense of limitations and (2) as to the events arising from the May 30, 1995 office visit based on Dr. Korthauer's negation of breach of the applicable standard of care, an essential element of Ms. Wilson's *prima facie* case for medical malpractice. Accordingly, we affirm the judgment of the trial court.

---

**8.** *See LeNotre v. Cohen,* 979 S.W.2d 723, 727 (Tex.App.—Houston [14th Dist.] 1998, pet. denied) (citing *Elam v. Yale Clinic,* 783 S.W.2d 638, 642 (Tex.App.—Houston [14th Dist.] 1989, no writ)).

**9.** Although Ms. Wilson contends that Dr. Korthauer's affidavits are "legally inadequate summary judgment proof" on other matters, she does not make the same claim regarding matters pertaining to the May 30th office visit or the testimony of her expert, Dr. Wilk. Therefore, we need not reach her contention that Dr. Korthauer's affidavits are inadequate.